UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. 08CR 515 |
| v. | ) ) ) | Violations: Title 18, United States Code, Sections 1001(a)(2), 1341, 1343 and 1346 |
| ROBERT J. WEINSTEIN | ) ) | |

JUDGE DOW
MAGISTRATE JUDGE VALDEZ

**FILED**
JUN 2 6 2008 TC
Jun 26, 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

### COUNT ONE

The SPECIAL JUNE 2007 GRAND JURY charges:

1.  At times material to this indictment:

    **Relevant Entities and Individuals**

    a.  Defendant ROBERT WEINSTEIN was a medical doctor and businessman.

    b.  Stuart Levine was an attorney and businessman, and an associate of defendant ROBERT WEINSTEIN.

    c.  Co-Schemer S was an associate of WEINSTEIN and Levine who lived in Europe and maintained accounts at various financial institutions in Chicago, Illinois.

    d.  John Glennon was the President and Chief Executive Officer of a consulting company, North American Capital Opportunities, LLC ("NACO"), located in Chicago, Illinois.

    e.  The Rosalind Franklin University of Medicine and Science, formerly known as the Finch University of Health Sciences/the Chicago Medical School ("CMS"),

was a not-for-profit medical school located in North Chicago, Illinois. CMS also owned real estate at 2020 W. Ogden Avenue in Chicago, Illinois, located near various hospitals and health care facilities. Defendant ROBERT WEINSTEIN and Levine were members of the board of trustees of CMS and in that capacity owed a duty of honest services to CMS.

  f. Developer A was in the business of developing health care-related properties in the Chicago area.

  g. IDDRS was a charitable organization. Rules and regulations of the Internal Revenue Service prohibited IDDRS from engaging in financial transactions with members of its board of trustees.

  h. The Northshore Supporting Organization ("NSO") was a charitable organization created in or about May 2001 by defendant ROBERT WEINSTEIN. WEINSTEIN caused NSO to identify its sole purpose as providing financial support to CMS. WEINSTEIN selected himself and Stuart Levine, along with one other individual, to be the members of NSO's board of trustees. While the rules and regulations of the IRS did not prohibit NSO from engaging in financial transactions with members of its board of trustees, as trustees of NSO, WEINSTEIN and Levine owed a duty of honest services to NSO and thus were required to act solely in the best interests of NSO and its identified purpose, namely the financial support of CMS.

### The Scheme To Defraud

  2. Beginning no later than in or about early 2000 and continuing through at least

2

in or about March 2003, in the Northern District of Illinois, Eastern Division, and elsewhere:

ROBERT J. WEINSTEIN,

defendant herein, Stuart Levine, Co-schemer S, and others, did devise, intend to devise, and participate in a scheme to defraud CMS and NSO of money, property, and the intangible right to the honest services of WEINSTEIN and Levine by means of materially false and fraudulent pretenses, representations, and material omissions, and in furtherance thereof used interstate carriers and interstate wires, which scheme is further described below.

### Overview of the Scheme

3. It was part of the scheme that WEINSTEIN and Levine, with the assistance of Co-Schemer S, fraudulently sought to obtain and obtained millions of dollars for the benefit of WEINSTEIN and Levine by wrongfully attempting to take and taking money and property belonging to CMS and NSO. In carrying out the scheme, WEINSTEIN and Levine misused their positions of trust with CMS and NSO and defrauded those victims of their rights to the honest services of WEINSTEIN and Levine. Among the fraudulent transactions in the course of the scheme were the following:

    a.    **Attempted Diversion of Money and Property In Connection With 2020 W. Ogden:** In 2000, WEINSTEIN and Levine sought to obtain millions of dollars for themselves in connection with CMS's proposed development of its real estate at 2020 W. Ogden, Chicago, by using their influence as trustees of CMS to require Developer A, as a condition of doing business with CMS, to enter into an agreement to pay Co-Schemer S

approximately 20% of the net profits of the development, even though Co-Schemer S would provide no services to the project and never even met with representatives of Developer A. Unbeknownst to CMS and Developer A, Co-Schemer S was acting, secretly, on behalf of WEINSTEIN and Levine as a middleman to conceal their financial interest in the project, and Co-Schemer S was to transfer some or all of the proceeds he received to WEINSTEIN and Levine. WEINSTEIN and Levine used John Glennon, CMS's consultant on the development project, to convey their unlawful demands to Developer A, in order to conceal their roles in making these demands and their receipt of any proceeds.

b.    **Diversion of Money and Property in Connection with Two Promissory Notes:**  WEINSTEIN and Levine looted $6 million from NSO with the assistance of Co-Schemer S by causing NSO to transfer $3 million to WEINSTEIN and Levine, respectively, in exchange for two $3 million promissory notes which WEINSTEIN and Levine never intended to repay. WEINSTEIN and Levine concealed this fraudulent taking by orchestrating a series of sham transactions among NSO, CMS, and Co-Schemer S which ultimately lead to the result that WEINSTEIN and Levine did not have to repay the $6 million, thereby allowing WEINSTEIN and Levine to take $6 million for themselves from NSO.

### 2020 W. Ogden

4.    It was further part of the scheme that in connection with the development of the CMS-owned property at 2020 W. Ogden in early 2000, WEINSTEIN and Levine agreed

that they would use John Glennon, CMS's consultant in connection with the 2020 W. Ogden property, to suggest to Developer A that it work with CMS to develop the property. As a result, on or about May 25, 2000, CMS and Developer A entered into an agreement in which Developer A agreed to conduct certain pre-development activities and determine the feasibility of commercially developing the 2020 W. Ogden property. CMS and Developer A also agreed that negotiation of the specific terms of a development agreement between them would be deferred for a period of time.

5. It was further part of the scheme that WEINSTEIN and Levine determined to take money from the 2020 W. Ogden development project for their personal benefit by requiring Developer A to enter into an agreement with their associate, Co-Schemer S. WEINSTEIN and Levine understood that Co-Schemer S would act on their behalf and conceal WEINSTEIN's and Levine's financial interest in the project, and would covertly transfer money he received from the project to WEINSTEIN and Levine.

6. It was further part of the scheme that WEINSTEIN and Levine initially directed Glennon to advise Developer A that Co-Schemer S was to be inserted into the project to provide a $1.2 million letter of credit in connection with the financing of the project in return for a 20% equity interest in the project.

7. It was further part of the scheme that WEINSTEIN and Levine subsequently directed Glennon to advise Developer A that Co-Schemer S would not be providing a letter of credit, but rather would be inserted into the project to provide financial consulting services

5

on an "as needed" basis in return for a 20% share of the net profits from the project, and without regard to the services actually provided by Co-Schemer S. WEINSTEIN and Levine knew at the time that the services of Co-Schemer S were not needed in connection with the financing of the project, had no intent that Co-Schemer S would provide services of value to the project, and expected that Co-Schemer S would share the proceeds of the scheme with WEINSTEIN and Levine. When Developer A questioned Co-Schemer S's role in the project, WEINSTEIN and Levine directed Glennon to reject those inquiries and tell Developer A that Co-Schemer S had to remain in the project if Developer A was to go forward with the project. Developer A failed to reach an agreement with Co-Schemer S and CMS then ended the role of Developer A in connection with the development of the 2020 W. Ogden property.

### The NSO Promissory Notes

8. It was further part of the scheme that within days of the formation of NSO in or about May 2001, WEINSTEIN and Levine discussed taking money from NSO, including by taking money in exchange for promissory notes payable to NSO.

9. It was further part of the scheme that on or about July 16, 2001, WEINSTEIN, in his position as president and sole director of IDDRS, transferred approximately $17.9 million from IDDRS to NSO.

10. It was further part of the scheme that on or about July 19, 2002, WEINSTEIN and Levine caused a total of $6 million to be transferred from NSO to them in exchange for

two promissory notes, with NSO transferring $3 million to a business entity controlled by WEINSTEIN and $3 million to a business entity controlled by Levine.

11. It was further part of the scheme that in or about December 2002, the promissory notes were changed to reflect that the borrowers of the $6 million were WEINSTEIN and Levine personally, as opposed to their business entities, and that each was personally responsible for repayment of $3 million plus interest to NSO.

12. It was further part of the scheme that WEINSTEIN and Levine agreed to cause NSO to "donate" the two promissory notes, with an aggregate face value of $6 million, to CMS in a series of transactions designed to give WEINSTEIN and Levine the promissory notes and to excuse their repayment of $6 million to NSO, as follows:

    a. CMS was advised that in order to obtain a donation of two promissory notes, CMS had to accept the donations in a sealed envelope and, not knowing the notes' value, provide those notes to Co-Schemer S who would give CMS $1 million in return for the notes.

    b. Unbeknownst to CMS and NSO, Co-Schemer S was acting on behalf of WEINSTEIN and Levine as a middleman and had agreed to return the promissory notes to WEINSTEIN and Levine as a "gift" and thereby extinguish their obligations to repay NSO $6 million plus interest.

13. It was further part of the scheme that in or about December 2002, Levine, in an effort to make the extinguishment of WEINSTEIN's and Levine's $6 million debt to NSO

appear to be legitimate through the $1 million donation, as described above, and to partially fund that $1 million donation to CMS, caused $628,000 to be transferred to Co-Schemer S.

14. It was further part of the scheme that in or about January 2003, WEINSTEIN and Levine caused CMS to be advised that it would receive $1 million in exchange for the two promissory notes and CMS agreed to the conditions relating to that exchange. On or about January 8, 2003, CMS executed documents to effect the exchange, agreeing to the escrow of the promissory notes in a sealed envelope and to effect the transfer of those notes to Co-Schemer S in exchange for $1 million. WEINSTEIN and Levine never disclosed to CMS the value of the notes, the fact that they were the obligors on the notes, or their agreement with Co-Schemer S for Co-Schemer S to "gift" the notes to WEINSTEIN and Levine to extinguish their obligations to repay the notes.

15. It was further part of the scheme that in or about January 2003, Co-Schemer S "gifted" the notes to WEINSTEIN and Levine, thereby extinguishing the personal obligations of WEINSTEIN and Levine to repay the $6 million plus interest to NSO (or any subsequent holder of the notes) as required by the notes.

16. It was further part of the scheme that on or about January 31, 2003, Co-Schemer S directed Goldman Sachs, a financial institution, to draw a $1 million check on his account and made payable to CMS in the amount of $1 million, which check was subsequently delivered to CMS in exchange for the two promissory notes.

17. It was further part of the scheme that in or about March 2003, Levine provided

Co-Schemer S with $372,000 to reimburse Co-Schemer S for the remaining balance of the $1 million.

18. It was further part of the scheme that WEINSTEIN and Levine did conceal and hide, and cause to be concealed and hidden, the purpose of the acts done in furtherance of the scheme.

19. On or about January 31, 2003, at Chicago, in the Northern District of Illinois, Eastern Division,

ROBERT J. WEINSTEIN,

defendant herein, for the purpose of executing the above-described scheme, and attempting to execute the above-described scheme, did knowingly cause to be transmitted in interstate commerce from Chicago, Illinois, to New York, New York, by means of wire communication in interstate commerce, certain writings, signs, signals, namely: a direction that a $1 million check be drawn on the account of Co-Schemer S at Goldman Sachs and made payable to Finch University of Health Sciences/the Chicago Medical School, which check was Co-Schemer S's payment in exchange for the two promissory notes;

In violation of Title 18, United States Code, Sections 1343, 1346, and 2.

## **COUNT TWO**

The SPECIAL JUNE 2007 GRAND JURY further charges:

1. The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 18 of Count One of this Indictment as though fully set forth herein.

2. On or about January 31, 2003, in the Northern District of Illinois, Eastern Division,

ROBERT WEINSTEIN,

defendant herein, for the purpose of executing the above-described scheme, and attempting to executive the above-described scheme, did knowingly cause an envelope to be sent by FedEx, a commercial interstate carrier according to the directions thereon, from Goldman Sachs in New York, New York, to Stuart Levine at an address in Delray Beach, Florida, which envelope contained a $1 million check drawn on the account of Co-Schemer S at Goldman Sachs and made payable to Finch University of Health Sciences/the Chicago Medical School, which check was Co-Schemer S's payment in exchange for the two promissory notes;

In violation of Title 18, United States Code, Sections 1341, 1346, and 2.

## COUNT THREE

The SPECIAL JUNE 2007 GRAND JURY further charges:

1.  At times material to this indictment:

    a.  Stuart Levine, a resident of Highland Park, Illinois, was a businessman and a member of the Illinois Health Facilities Planning Board ("Planning Board").

    b.  The Planning Board was a commission of the State of Illinois, established by statute, whose nine members were appointed by the Governor of the State of Illinois. State law required an entity seeking to build a hospital, medical office building, or other medical facility in Illinois to obtain a permit, known as a "Certificate of Need" ("CON"), from the Planning Board prior to beginning construction. Issuance of a CON required a majority vote of the Planning Board.

    c.  Antoin Rezko, also known as "Tony" Rezko ("Rezko"), a resident of Wilmette, Illinois, was a businessman and a fund-raiser for candidates for elected office.

    d.  There was a federal criminal investigation into allegations of mail fraud, wire fraud, bribery, political corruption, and other criminal activities in connection with the operations of certain State of Illinois boards and commissions, including the Planning Board. Among other matters, this investigation concerned the appointment of, control of, and directions given by third parties to members of the boards and commissions. One aspect of this investigation related to Stuart Levine and those associated with him, including Rezko and WEINSTEIN, and to the nature and scope of the business, personal, and financial

11

relationships among and between them. It was material to this investigation to learn what influence Rezko had in connection with the boards' and commissions' operations.

2. On or about May 24, 2004, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROBERT J. WEINSTEIN,

defendant herein, knowingly and willfully did make materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the Federal Bureau of Investigation of the Department of Justice, an agency of the United States government, in that WEINSTEIN stated to a Federal Bureau of Investigation Special Agent that Levine never told WEINSTEIN that Rezko had influence over the Illinois Health Facilities Planning Board, whereas at the time WEINSTEIN made this statement and representation, WEINSTEIN knew the statement and representation was false because, in truth and fact, WEINSTEIN and Levine discussed Rezko's influence over the Planning Board, including in a recorded conversation on April 21, 2004 in which they discussed Rezko's involvement in the Planning Board and Levine explicitly advised WEINSTEIN of Rezko's role in manipulating the Planning Board's vote earlier that day on the CON application of Mercy Health System Corporation Hospital, as well as other Planning Board matters;

In violation of Title 18, United States Code, Section 1001(a)(2).

A TRUE BILL:

_____
FOREPERSON

_____
UNITED STATES ATTORNEY